## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| JAMES SPITZLEY and JESSIE STALLWORTH, individually and as representatives of a class of participants and beneficiaries in and on behalf of the MERCEDES-BENZ U.S. INTERNATIONAL, INC. RETIREMENT AND SAVINGS PLAN, <br><br> Plaintiffs, <br><br> v. <br><br> MERCEDES-BENZ U.S. INTERNATIONAL, INC.; THE BOARD OF DIRECTORS OF MERCEDES-BENZ U.S. INTERNATIONAL, INC.; THE ADMINISTRATIVE COMMITTEE FOR THE MERCEDES-BENZ U.S. INTERNATIONAL, INC. RETIREMENT AND SAVINGS PLAN; and JOHN AND JANE DOES 1-30, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 7:21-cv-00074-RDP <br><br> CLASS ACTION |

## FIRST AMENDED COMPLAINT

Plaintiffs James Spitzley and Jessie Stallworth (collectively "Plaintiffs"), on behalf of the Mercedes-Benz U.S. International, Inc. Retirement and Savings Plan (the "Plan" or "MBUSI Plan"), themselves as Plan participants, and all others similarly situated, by and through their attorneys, allege as follows:

## I.    NATURE OF ACTION AND INTRODUCTION

1.    This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants. The action asserts claims for breaches of fiduciary duties and other violations of 29 U.S.C. §1132(a)(2) and (3) against the Plan's fiduciaries, which include: the Board of Directors of Mercedes-Benz U.S. International, Inc.; the Administrative Committee for the Mercedes-Benz U.S. International, Inc.

Retirement and Savings Plan; Mercedes-Benz U.S. International, Inc.; and John and Jane Does 1-30 (collectively, "Defendants").

2.      Every year, millions of employees entrust their retirement savings to plans established under ERISA. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act prudently to protect Plan participants and their hard-earned retirement dollars.

3.      The essential remedial purpose of ERISA is to protect the beneficiaries of private retirement plans. ERISA fiduciaries have a continuing duty to evaluate fees and expenses being assessed to a plan in order to make sure those charges are reasonable and prudent.

4.      Failures by ERISA fiduciaries to monitor costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

5.      The table below illustrates how fees impact retirement accounts over time.[1] The table illustrates that where an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000, or 14%, less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference is substantial. In fact, the impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged almost double (7%) the 4% in the SEC example (*see, e.g.*, Net Weighted Geometric Rate of Return of Defined Contribution Plans from 1990-2012 as calculated by the Center for Retirement Research, Investment Returns: Defined Benefit vs. Defined Contribution Plans, December 2015, Number 15-21, p. 3, Table 4. Center for Retirement Research).

---

[1] *See* https://www.sec.gov/files/ib_mutualfundfees.pdf (last visited Dec. 18, 2020).



**Portfolio Value From Investing $100,000 Over 20 Years**

In 20 years, 0.50% annual fees reduce portolio value (red line) by $10,000 compared to a portfolio with a 0.25% annual fee (blue line).

In 20 years, 1.00% annual fees reduce portfolio value (green line) by nearly $30,000, compared to a portfolio with a 0.25% annual fee (blue line).

— 4% annual return less 0.25% annual fee

— 4% annual return less 0.50% annual fee

— 4% annual return less 1.00% annual fee

6.      Indeed, one court recently noted:

Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan . . . by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.[2]

7.      The Defendants are ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority or discretionary control over the Plan, which Defendants sponsor and administer.

8.      ERISA imposes a strict fiduciary duty of prudence upon Defendants as Plan fiduciaries, pursuant to 29 U.S.C. § 1104(a). ERISA's fiduciary duties are among the highest duties known to the law, requiring fiduciaries to perform their obligations solely in the best interests of a plan's participants and beneficiaries. As fiduciaries to the Plan, Defendants were and are obligated to act for the exclusive benefit of Plan participants and beneficiaries, and to ensure that Plan fees and expenses are reasonable.

---

[2] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (internal citation and quotations omitted).

9.    Defined contribution retirement plans are often categorized in terms of the value of the assets in the plan. For example, plans with less than $5 million in assets are often classified as "micro" plans, plans with between $5 and $50 million in assets are considered "small" plans, plans with assets between $50 and $200 million in assets are considered "mid" plans, and plans with greater than $200 million in assets are considered "large" plans.

10.    With 4,457 participants and over $984 million in net assets as of December 31, 2019, based on publicly-available Form 5500 data, the Plan is larger than 99.60% of defined contribution plans in terms of participants and larger than 99.83% in terms of assets and is thus considered a "large" retirement plan.

11.    The marketplace for retirement plan services is well-established and highly competitive. Because there was more than $500 million in assets in the Plan during the Class Period, the Plan had tremendous bargaining power to demand low-cost administrative and investment management services.

12.    Prudent plan fiduciaries continuously monitor investment fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable investment fees and stay informed of the competitive reasonable market price for retirement plan services.

13.    But instead of leveraging the Plan's substantial bargaining power to benefit Plan participants and beneficiaries, Defendants caused the Plan to pay unreasonable and excessive fees for retirement plan services in relation to the services being provided to the Plan.

14.    Upon information and belief, during the Class Period, Defendants breached their duties owed to the Plan, to Plaintiffs, and all other Plan Participants by:

    a.    failing to monitor the retirement plan service fees paid by the Plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively

4

unreasonable and excessive retirement plan service fees, relative to the retirement plan services received;

b.      failing to understand the methodology by which fee payments such as revenue sharing are paid to retirement service providers;

c.      failing to take standard and customary actions to understand the market for retirement plan services in order to monitor for reasonableness the retirement plan service fees paid by the Plan in relation to the retirement plan services received; and

d.      failing to monitor the fees of plan investment advisory service providers paid by the Plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive plan investment advisory fees relative to the plan investment advisory services received.

15.     The Plan's objectively unreasonable retirement plan service fees cannot be justified. During the Class Period, the Plan paid between $239 and $567 per participant annually for retirement plan services. During the Class Period, reasonable retirement plan service fees for a plan of this size would have averaged $53 per participant annually.

16.     Defendants' failures to monitor retirement plan service fees and ensure their reasonableness breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) plans continuously monitor the market for retirement plan services to ensure the fees paid by the plan are reasonable. Defendants did not engage in prudent decision-making processes, as there is no other explanation for why the Plan paid these objectively unreasonable fees for retirement plan services.

17.     Plaintiffs were injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive retirement plan service fees, which reduced their Plan

account balances and caused them significantly diminished investment returns.

18.    Likewise, the Plan's objectively unreasonable plan advisory service fees cannot be justified. During the Class Period, the Plan paid over $300,000 in 2016 for plan investment advisory services when the reasonable annual rate for those services is no higher than around $100,000.

19.    To remedy Defendants' fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

20.    The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"). other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials become available in the course of this litigation.

## II.    <u>**JURISDICTION AND VENUE**</u>

21.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq*.

22.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, have significant contacts within this District, and because

ERISA provides for nationwide service of process.

23.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### A.      Plaintiff James Spitzley

24.     Plaintiff James Spitzley ("Spitzley") is a resident of McCalla, Alabama. Spitzley is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because he has a vested account balance in the Plan and his beneficiaries are or may become eligible to receive benefits under the Plan. Spitzley participates in the Plan through his employer, Mercedes-Benz U.S. International, Inc. ("MBUSI"). At all relevant times, Spitzley was and is a participant in the Plan. During the Class Period, Spitzley paid excessive recordkeeping fees directly and indirectly through revenue sharing.

25.     During the Class Period, Spitzley held investments in Plan investment options that paid revenue sharing and sub-transfer agency fees.

26.     Spitzley has Article III standing to bring this action on behalf of himself because he suffered an actual injury to his own individual Plan account in which he is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

27.     The Plan also suffered harm caused by Defendants' fiduciary breaches and remains

exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Spitzley's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Spitzley and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Spitzley.

28. Spitzley did not have knowledge of all material facts (including, among other things, the retirement plan service fees, Plan investment advisor fees, and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Spitzley lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

### B. Plaintiff Jessie Stallworth

29. Plaintiff Jessie Stallworth ("Stallworth") is a resident of North Port, Alabama. Stallworth is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because he has a vested account balance in the Plan and his beneficiaries are or may become eligible to receive benefits under the Plan. Stallworth participates in the Plan through his employer, MBUSI. At all relevant times, Stallworth was and is a participant in the Plan. During the Class Period, Stallworth paid excessive recordkeeping fees directly and indirectly through revenue sharing.

30. During the Class Period, Stallworth held Plan investment options that paid revenue sharing and sub-transfer agency fees.

31. Stallworth has Article III standing to bring this action on behalf of himself because

he suffered an actual injury to his own individual Plan account in which he is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

32.    The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Stallworth's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Stallworth and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Stallworth.

33.    Stallworth did not have knowledge of all material facts (including, among other things, the retirement plan service fees, Plan investment advisor fees, and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Stallworth lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

## B.    **Defendants**

34.    Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI")[3] is a company with a principal place of business located at 1 Mercedes Drive, Vance, Alabama 35490. Per the Plan's Forms 5500, MBUSI is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan

---

[3] In this Complaint, MBUSI refers to the named Defendant MBUSI and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

Sponsor under 29 U.S.C. § 1002(16)(B). As the Plan Administrator, MBUSI is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). MBUSI has responsibility and discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of recordkeeping and administrative services to the Plan. MBUSI acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. MBUSI appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

35.    Defendant Board of Directors of Mercedes-Benz U.S. International, Inc. ("Board of Directors") is, on information and belief, located at 1 Mercedes Drive, Vance, Alabama 35490 and has authority to manage and control the administration and operation of the Plan through the appointment of the members of the Administrative Committee for the Mercedes-Benz U.S. International, Inc. Retirement and Savings Plan and oversight of the Committee. The Board of Directors and its members, in their individual capacities, exercised authority and control over Plan management and Plan assets, and thus are Plan fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

36.    Defendant Administrative Committee for the Mercedes-Benz U.S. International, Inc. Retirement and Savings Plan ("Committee") is, on information and belief, located at 1 Mercedes Drive, Vance, Alabama 35490. The Committee and its members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). According to the Plan's

10

Forms 5500, the Committee, *inter alia*, "is responsible for oversight of the Plan"; "determines the appropriateness of the Plan's investment offerings, monitors investment performance, and reports to the Board of Directors."

37.     Defendants John and Jane Does 1-30 are unknown individuals comprising of Defendants the Board of Directors and the Committee; any officers, directors, or employees of Defendant MBUSI; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiffs reserve the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

38.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

## IV.     MERCEDES-BENZ U.S. INTERNATIONAL, INC. RETIREMENT AND SAVINGS PLAN

39.     The name of the Plan is the Mercedes-Benz U.S. International, Inc. Retirement and Savings Plan. The Plan's Employer Identification Number (EIN) is 36-3879353 and the Plan has been assigned the three-digit plan number 001.

40.     The Plan is subject to ERISA and is, on information and belief, established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

41.     The Plan is a defined contribution retirement plan, pursuant to 29 U.S.C. §§ 1002(2)(A) and 1002(34). In defined contribution plans, the value of a participant's retirement account is determined solely by, and thus is limited to, employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses.

Employees contribute a percentage of their pre-tax earnings to the Plan through an individual account, which is invested in investment options chosen from an investment lineup selected by the Plan's fiduciaries.

42.     The Plan provides the primary source of retirement income for many employees of MBUSI. The ultimate retirement benefit provided to Plan participants depends on the performance of investment options chosen for the Plan by Defendants, net of fees and expenses. Participants have the right to direct the investment of their account dollars to the available investment choices chosen by the Plan fiduciaries.

43.     The majority of fees assessed to participants are attributable to two general categories of services: retirement plan service fees (primarily comprised of recordkeeping and plan administration), and investment management fees. These expenses significantly reduce the value of an account in the Plan. The Plan fiduciaries are required to control Plan expenses, including those associated with the service providers selected and hired to administer the Plan (e.g., recordkeepers). The Plan fiduciaries are also responsible for negotiating and approving fees paid to the Plan service providers, whether directly or indirectly paid.

44.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1825 (2015).

45.     The impact of excessive fees on the Plan's employees' and retirees' retirement

12

assets is dramatic. The DOL has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. [4]

46. Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a 2019 survey conducted by TD Ameritrade, of 1,000 investors, only 27% believed they knew how much they were paying in fees as participants in 401(k) plans. It is incumbent upon plan fiduciaries to look out for plan participants, protect their retirement dollars, and make sure fees remain reasonable.

## V. FACTUAL BACKGROUND

### A. OVERVIEW OF RETIREMENT PLAN SERVICES IN DEFINED CONTRIBUTION PLANS

47. In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan. The assets of a defined contribution plan are held by a trustee in a single trust. The plan allocates the trust assets among plan participants through a retirement plan services provider (often referred to generically as a "recordkeeper"), that tracks each participant's account, which consists of his/her share of plan investments and returns.

48. Fiduciaries of virtually all "large" defined contribution plans hire one "retirement plan services" provider to provide the essential recordkeeping and administration ("RK&A") services necessary to offer the plan. RK&A services are necessary for defined contribution plans, and these services often include, but are not limited to: maintaining plan records; tracking participant account balances and investment elections; providing transaction processing; providing call center support and investment education and guidance; providing participant communications; and providing trust and custodial services.

---

[4] United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

49.     Some retirement plan service providers provide purely recordkeeping, administration, and related services, while others are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

50.     Retirement plan service providers typically offer the RK&A services as a bundle of services that are provided to all plan participants. Retirement plan service providers also charge separate additional fees for individual transactions and/or services that are utilized only by specific participants, e.g., loan initiation and maintenance fees. The fees charged for participant-specific services typically account for an insignificant portion of the total fees charged for providing retirement plan services and are not included in the bundled fee for the RK&A services provided to all plan participants.

51.      Since the mid-2000s, the retirement plan services provided to "large" defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most recordkeepers offer the same bundles and combinations of services as other competitor recordkeepers. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for "large" plans that, like the Plan, have a sizable number of participants and a large amount of assets.

52.     In recent decades, the fee that retirement plan service providers have been willing to accept for providing retirement plan services has significantly decreased.

53.     By the start of and during the entire Class Period, the level of fees that retirement plan service providers have been willing to accept for providing retirement plan services, including the RK&A services, has stabilized and has not materially changed. In other words, reasonable

retirement plan service fees paid in 2018 are representative of the reasonable fee for retirement plan services during the entire Class Period.

54.    Recordkeepers for larger defined contribution plans, like the Plan, experience efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the recordkeeper can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

55.    Moreover, the cost to a recordkeeper to provide retirement plan services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. In other words, the average cost to provide retirement plan services is materially identical for a participant that has $10,000 and a participant that has $100,000 or $1,000,000 in plan assets.

56.    Therefore, while the total cost to provide retirement plan services increases as more participants join the plan, the cost per participant to deliver the retirement plan services decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

57.    Sponsors of defined contribution plans negotiate and contract for retirement plan services separately from any contracts related to the selection of investment management services provided to plan participants.

58.    The investment options selected by plan fiduciaries often have a portion of the total

15

expense ratio allocated to the provision of retirement plan services that the recordkeeper provides on behalf of the investment manager.

59. As a result, retirement plan service providers often make separate contractual arrangements with mutual fund providers. Retirement plan service providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known in the defined contribution industry as "revenue sharing."

60. For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the retirement plan service provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

61. In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to retirement plan services and, in some cases, other services provided to a plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

62. Providers of retirement plan services, including RK&A services, typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

63. Regardless of the pricing structure that the plan fiduciaries negotiate with the recordkeeper, the amount of compensation paid to the recordkeeper for the retirement plan services

must be reasonable.

64.    As a result, plan fiduciaries must understand the total dollar amounts being paid to their retirement plan service provider(s) and be able to determine whether the compensation is reasonable by evaluating what the market is for the retirement plan services being received by the plan.

65.    Because retirement plan service fees are actually paid in dollars and because of the cost dynamic noted *supra*, the fees paid for retirement plan services are evaluated and compared on a dollars-per-participant basis.

66.    It is axiomatic in the retirement plan services industry that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis, and that as participant counts increase, the effective per-participant retirement plan service fee should decrease, assuming the same services are provided.

**B.    STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING AND MONITORING RETIREMENT PLAN SERVICE PROVIDERS**

67.    Plan fiduciaries are required to fully understand all sources of revenue received by retirement plan service providers or recordkeepers. Fiduciaries must regularly monitor the revenue being paid to retirement plan service providers to ensure that the compensation received is and remains reasonable in view of the services being provided.

68.    The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in

17

light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[5]

69. The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[6]

70. Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for retirement plan services by soliciting competitive bids from other retirement plan service providers to perform the same services currently being provided to the plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most retirement plan service providers would require only the number of participants and the amount of the assets to provide a quote for retirement plan services, while others might only require the number of participants.

71. Prudent fiduciaries have all this information readily available and can easily receive a quote from other retirement plan service providers to determine if the current level of fees being charged to the plan is reasonable.

72. Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

73. After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated retirement plan service fee. The employer/plan sponsor can pay the retirement

---

[5] *See A Look at 401(k) Plan Fees*, *supra*, note 4, at 2.

[6] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

plan service fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Typically, however, the employer decides to have the plan (*i.e.*, participants) pay the retirement plan service fees. If the retirement plan service fees are paid by participants, the fiduciaries can allocate the negotiated retirement plan service fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

74.     In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the retirement plan service fees pro rata to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 for retirement plan services. If the Plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the plan could allocate the $500,000 to participants by requiring that each participant pay 10 basis points.

75.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the retirement plan services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

76.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's

recordkeeper putatively for providing marketing, RK&A, and sometimes other retirement plan services on behalf of the mutual fund. These fees include: 12b-1 fees, which are paid by the funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees.

77.     Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable retirement plan service fees.

78.     Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue from any source (including revenue sharing payments) that exceeds a reasonable retirement plan service fee based on the market rate for the same services.

79.     The standard of care outlined above was well known and established prior to the Class Period among prudent plan fiduciaries based on DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, the standard of care exercised by prudent retirement plan professionals was described by Mercer Investment Consulting, a prominent retirement plan investment consultant, and included, but was not limited to, the following:

      a.     "Price administrative fees on a per-participant basis."

      b.     "Benchmark and negotiate recordkeeping and investment fees separately."

      c.     "Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size."

d.      "Benchmark and negotiate recordkeeping and trustee fees at least every other year."

e.      "Review services annually to identify opportunities to reduce administrative costs."[7]

80.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.

81.     First, fiduciaries must pay close attention to the recordkeeping fees being paid by the plan. A hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

82.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

83.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will often include conducting a request for proposal ("RFP") process at

---

[7] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting, at 3-4 (2013).

reasonable intervals. More specifically, it was understood that the best practice standard of care was that an RFP should be issued once every three to five years.

84. That said, by merely soliciting bids from other retirement plan service providers, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to retirement plan service providers to provide a competitive bid.

85. All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

**C.    THE PLAN IMPRUDENTLY PERMITTED EXCESSIVE RETIREMENT PLAN SERVICE FEES TO BE PAID TO VOYA**

86. At all relevant times, the Plan's retirement plan service fees were excessive when compared with other similar-size plans. The fees charged to the Plan were excessive relative to the retirement plan services received by the Plan. These excessive fees led to lower net returns, eating into and substantially reducing Plaintiffs' and Plan participants' retirement savings.

87. Between 2015 and 2019, Plan participants paid for retirement plan services directly through fees deducted from their accounts and indirectly through revenue sharing.

88. From at least 2016, each Plan participant paid a retirement plan service fee of $10.33 per month or $123.96 per year deducted directly from their accounts. This amount alone is double the reasonable retirement plan service fee for a plan this size. The Plan's recordkeeper

characterized this fee during the Class Period variously as a "recordkeeping" fee or an "administrative" fee.

89.    However, in addition to collecting $123.96 per year from each Plan participant by directly extracting the fee from participant accounts, the Plan (*i.e.*, the participants) also paid additional retirement plan service fees indirectly through revenue sharing. During the Class Period, the Plan disclosed payment of the following direct and indirect (revenue sharing) compensation to Voya Institutional Plan Services ("Voya") in Schedule C of the Plan's Forms 5500:

| Compensation to Voya Institutional Plan Services (source: Forms 5500, Schedule C) | | | | |
|---|---|---|---|---|
| **Plan Year** | **Direct** | **Indirect** [8] | **Service Codes** | **Service Code Explanations** |
| 2015 | $1,219,843 | $659,806 | 37, 49, 57 | Participant loan processing; Other services; Redemption fees |
| 2016 | $93,359 | $629,235 | 37, 57, 64 | Participant loan processing; Redemption fees; Recordkeeping fees |
| 2017 | $416,888 | $223,686 | 37, 49, 57, 64 | Participant loan processing; Other services; Redemption fees; Recordkeeping fees |
| 2018 | $883,292 | $242,189 | 37, 49, 57, 64 | Participant loan processing; Other services; Redemption fees; Recordkeeping fees |
| 2019 | $699,052 | $299,687 | 37, 49, 64 | Participant loan processing; Other services; Recordkeeping fees |
| Total | $3,312,434 | $2,054,603 | | |
| **Grand Total** | **$5,367,037** | | | |

90.    The Notes to the Financial Statements in the Plan's Forms 5500 also disclose that for each year in the Class Period, Defendants permitted the Plan to pay sub-transfer agency fees to Voya. Sub-transfer agency fees are fees paid by mutual fund managers to a recordkeeper who holds an omnibus account at the mutual fund company. Omnibus accounting eliminates the need

---

[8] Indirect compensation was not disclosed in 2015, 2018, and 2019. Indirect compensation for those years is calculated using publicly-available revenue sharing rates associated with each Plan investment for each of those years.

for the mutual fund company to maintain individual participant accounts. Instead, participant accounts are maintained by the recordkeeper. Because this effectively shifts some costs from the mutual fund to the recordkeeper, the mutual fund companies pay the recordkeeper a fee for this service. Typically, this fee ranges from 0.10% to 0.35% of invested assets but can be much higher or, in some cases the mutual fund company pays no fee.

91.     The sub-transfer agency fee is included as part of the mutual fund's operating expense, which is paid by the Plan participants who invest in the fund. Because a portion of that operating expense is paid to Voya to compensate it for recordkeeping, Plan participants who invest in the mutual funds paying sub-transfer agency fees to Voya essentially paid Voya twice for recordkeeping services.

92.     The table below reflects sub-transfer agency fees paid to Voya during the Class Period:

| Sub-Transfer Agency Fees to Voya (source: Forms 5500, Notes to Financials) | |
|---|---|
| **Plan Year** | **Fees** |
| 2015 | $129,843 |
| 2016 | $180,772 |
| 2017 | $314,159 |
| 2018 | $699,533 |
| 2019 | $617,918 |
| **Total** | **$1,942,225** |

93.     Prudent plan fiduciaries monitor and limit the amount of indirect compensation, such as 12b-1 and sub-transfer agency fees, to make sure that plan participants are not overcharged for recordkeeping, and require that excessive fees be rebated to plan participants. Here, Defendants failed to properly monitor the indirect compensation paid to Voya, which caused the Plan to pay excessive retirement plan service fees for the Class Period.

94.     During the Class Period, the Plan paid between $900,000 and $1.8 million in

retirement plan service fees per year. The table below demonstrates the retirement plan service fees paid to Voya during the Class Period:

| Total Retirement Plan Service Fees | | | | | | |
|---|---|---|---|---|---|---|
| **Plan Year** | **2015** | **2016** | **2017** | **2018** | **2019** | **Total** |
| Voya (direct) | $1,219,843 | $93,359 | $416,888 | $883,292 | $699,052 | $3,312,434 |
| Voya (indirect) | $659,806 | $629,235 | $223,686 | $242,189 | $299,687 | $2,054,603 |
| Voya (sub-transfer agency) | $129,843 | $180,772 | $314,159 | $699,533 | $617,918 | $1,942,225 |
| **Total** | $2,009,492 | $903,366 | $954,733 | $1,825,014 | $1,616,657 | **$7,309,262** |

95. For all Plan years during the Class Period, the Plan paid $7,309,262 in total retirement plan service fees.

96. During the Class Period, Plaintiffs and Plan participants paid anywhere between $239 and $567 in retirement plan service expenses per year. The table below shows the actual and average yearly per-participant retirement plan service fees paid by the Plan:

| Retirement Plan Service (RPS) Fees Per-Participant Cost | | | | | | |
|---|---|---|---|---|---|---|
| | Plan Year | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | *Average* |
| **Participants** | 3,544 | 3,746 | 3,993 | 4,142 | 4,457 | *3,976* |
| **RPS Fees** | $2,009,492 | $903,366 | $954,733 | $1,825,014 | $1,616,657 | *$1,461,852* |
| **Per-Participant RPS Fee** | $567 | $241 | $239 | $441 | $363 | *$368* |

97. The table illustrates that the Plan had on average 3,976 participants and paid an average effective annual RK&A fee of approximately $1.46 million, which equates to an average of approximately $368 per participant, per year. This fee is exorbitant and unreasonable. Defendants' decision to maintain this retirement plan services relationship in

which Plan participants were paying on average $368 per person per year was imprudent. This high per-participant retirement plan service expense is not in line with the fees paid by participants in other similar plans administered by prudent fiduciaries.

98.    The table above also reflects that retirement plan service fees for the Plan did not decline in correlation with the year-over-year increase of Plan participants, which grew from 3,544 to 4,457 over a five-year period. The cost of adding participants to a recordkeeping platform is relatively low, and when participant numbers grow, the unit cost of delivering services on a per-participant basis should decrease. This inverse correlation of participants to the effective annual per participant retirement plan service fees was not manifested in the Plan during the Class Period. The Defendants should have been able to achieve a decrease in the annual per-participant retirement plan service fee as the number of participants in the Plan grew, but they failed to do so.

99.    The Plan's fiduciaries were required to continuously monitor retirement plan service fees, and to regularly solicit competitive bids to ensure fees paid to Voya were reasonable. However, Defendants failed to employ prudent processes for ensuring that fees were and remained reasonable. To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable fees paid for retirement plan services.

100.    Due to Defendants' fiduciary failures and the absence of prudent fiduciary processes to monitor fees for reasonableness, the Plan's retirement plan service fees were significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than retirement plan service fees assessed to participants in similar plans. The table below illustrates the effective annual per participant retirement plan service fees paid

in 2018 by other comparable plans with similar numbers of participants derived from Form 5500 filings, compared to the average effective annual per participant retirement plan service fee paid by the Plan (as identified in the table above) during the Class Period.

**Comparable Plans' Retirement Plan Service Fees Based on Publicly Available Information from Form 5500** [9]

| Plan | Participants | Assets | Retirement Plan Service Fees | Retirement Plan Service Fee / pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Weil, Gotshal & Manges Section 401(K) Savings And Investment Plan | 2,564 | $469,229,171 | $146,518 | $57 | Transamerica | White |
| H&E Equipment Services, Inc. 401(K) Profit Sharing Plan | 2,693 | $104,755,982 | $173,389 | $64 | Voya | Blue |
| Crum & Forster Employee Savings Plan | 3,009 | $305,102,969 | $166,902 | $55 | Vanguard | White |
| Fruit Of The Loom 401K Retirement Savings Plan | 3,554 | $185,899,268 | $227,869 | $64 | T. Rowe Price | White |
| Associated Materials, LLC 401(K) Retirement Plan | 3,639 | $99,814,049 | $179,475 | $49 | ADP | White |
| **Mercedes-Benz US International Plan Average Fee** | **3,976** | **$779,504,616** | **$1,461,853** | **$368** | **Voya** | **Red** |
| Hitachi Vantara Corporation Retirement And Savings Program | 3,890 | $680,441,899 | $174,568 | $45 | Fidelity | White |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |

---

[9] Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

| Plan | Participants | Assets | Retirement Plan Service Fees | Retirement Plan Service Fee / pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Mercedes-Benz USA, LLC Employees' Retirement Savings Plan | 5,713 | $572,242,547 | $331,038 | $58 | Voya | Blue |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | White |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | White |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | White |
| Waste Connections, Inc. 401k Profit Sharing Plan | 7,923 | $332,567,264 | $455,853 | $58 | Voya | Blue |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |

101.    Similarly, the graph below illustrates the average annual retirement plan service fee paid by the Plan compared to the effective annual per participant retirement plan service fee paid by the plans identified in the table above, with the white data points representing retirement plan service fees that recordkeepers offered to (and were accepted by) comparable Plans.



102. As the above graph makes clear, during the Class Period both smaller plans (for which the reasonable retirement plan service fees are higher) and plans of a comparable size to the Plan paid significantly lower per-participant retirement plan service fees than the Plan, including other plans which use Voya as recordkeeper.

103. This graph illustrates that other retirement plan service providers as well as the Plan's own recordkeeper would have accepted much lower retirement plan service fees for the identical services received by the Plan.

104. The level and quality of service provided by Voya as the Plan recordkeeper did not justify paying on average around seven times more than the reasonable market rate for retirement plan services. This is especially clear since almost one third of the comparable plans used the same recordkeeper as the Plan did (Voya) and these comparable plans all paid less than $65 per year.

105. Based upon a review of the Plan's Forms 5500, on information and belief the Plan also did not rebate any of the monies received from revenue sharing back to Plan participants to offset the retirement plan service fees paid by the participants.

106. Because revenue sharing payments are asset-based, the already-excessive compensation paid to the Plan's recordkeeper became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other prudently administered plans do, but failed to do so.

107. Had Defendants been acting in the exclusive best interest of the Plan's participants and engaged in prudent processes for selecting and negotiating with retirement plan service providers, rather than paying an effective average of approximately $368 per participant per year in retirement plan service fees during the Class Period, the Defendants would have put retirement plan services out for periodic bidding and would have identified a service provider (be it Voya or a new service provider) that would have accepted on average around $53 per participant per year for the Plan.

108. The $368 per-participant-per-year average is around seven times the amount charged to participants in similar plans where prudent fiduciaries have established and maintained a prudent recordkeeping setup. Prudent fiduciaries would have never initially agreed to the retirement plan service fees being assessed to the Plan participants starting in 2015, nor would prudent fiduciaries have permitted the unreasonable retirement plan service fees to continue in perpetuity.

109. Defendants did not regularly and/or reasonably assess the Plan's retirement plan service fees being paid to Voya. Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the retirement plan service fees it paid to Voya vis-à-vis the fees that other retirement plan service providers would charge for the same services.

110. Defendants knew or should have known that ERISA's duty of prudence required

them to engage in processes to evaluate the Plan's retirement plan service fees, but Defendants simply failed to do so. Had Defendants done so, they would have realized that the Plan was compensating Voya unreasonably and inappropriately in view of the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan participants, and that the fees were excessive relative to the services received.

111. Defendants' failure to recognize that the Plan and its participants were grossly overcharged for retirement plan service fees and their failure to take effective remedial actions shows a lack of or a complete disregard for a prudent process and was a breach of their fiduciary duties to Plaintiffs and the Plan participants.

112. Defendants imprudently failed to monitor and control the compensation paid by the Plan for retirement plan services, including indirect and direct compensation, sub-transfer agency fees, and asset-based revenue sharing received by the Plan's recordkeepers. Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

**D.   THE PLAN IMPRUDENTLY OVERPAID R.V. KUHNS FOR PLAN SERVICES**

113. Defendants retained R.V. Kuhns & Associates ("R.V. Kuhns") to advise the Plan regarding investment options in 2016.

114. Similar to retirement plan services, there are efficiencies of scale related to the provision of plan investment advisory services. In other words, the standard of care for providing plan investment advisory services to help a plan fiduciary select and monitor the investment options made available to participants is the same for a plan with $100,000,000 as it is for a plan with $1,000,000,000. As a result, the reasonable market rate for plan investment advisory services

during the Class Period capped out at around $100,000 per year.

115.   R.V. Kuhns was compensated by the Plan during the Class Period as follows:

| Compensation to R.V. Kuhns & Associates, Inc. (source: Forms 5500, Schedule C) | | | | |
|---|---|---|---|---|
| **Plan Year** | **Direct** | **Indirect** | **Service Codes** | **Service Code Explanations** |
| 2016 | none disclosed | $319,036 | 27, 64 | Investment advisory (plan); Recordkeeping fees |
| 2017 | $20,793 | $77,259 | 27, 64 | Investment advisory (plan); Recordkeeping fees |
| 2018 | $105,421 | none disclosed | 27 | Investment advisory (plan) |
| 2019 | $87,167 | none disclosed | 27 | Investment advisory (plan) |
| Total | $213,381 | $396,295 | | |
| **Grand Total** | **$609,676** | | | |

116.   Upon knowledge and belief, in 2016 Defendants agreed to compensate R.V. Kuhns exclusively through revenue sharing without capping the amount R.V. Kuhns would be paid or requiring R.V. Kuhns to rebate amounts over the cap.

117.   As a result, R.V. Kuhns was paid $319,036 in 2016 for investment advice to the Plan. That amount is roughly three times the reasonable annual rate for plan investment advisory services. This is evident from the fact that R.V. Kuhns charged the Plan $98,052 in 2017, $105,421 in 2018 and $87,167 in 2019 for the same services. Further, R.V. Kuhns was not paid through revenue sharing after 2017. In other words, the Plan paid R.V. Kuhns an average of $96,880 from 2017 through 2019. This is on the high end of a reasonable fee for plan "Investment advisory" services. In 2016, however, the Plan fiduciaries allowed R.V. Kuhns to be paid an unreasonable and excessive fee for the services provided by R.V. Kuhns.

118.   Prudent fiduciaries of similarly-sized defined contribution plans monitor plan investment advisors to make sure their fees are reasonable. If a plan investment advisor is paid

through revenue sharing, a prudent plan fiduciary will ensure that the total compensation paid by the plan is reasonable by ensuring that any excessive fees received by the plan investment advisor through the revenue sharing structure are returned to the plan and/or plan participants.

119.    Defendants' failure to monitor or cap R.V. Kuhns' fees in 2016 or obtain a rebate of those fees shows a lack of or a complete disregard for a prudent process and was a breach of their fiduciary duties to Plaintiffs and the Plan participants.

## VI.    ERISA'S FIDUCIARY STANDARDS

120.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or the other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

121.    As set forth above and herein, Defendants are Plan fiduciaries. ERISA imposes a strict fiduciary standard of prudence on Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

(a)  Prudent man standard of care

(1)    . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)  for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

&ast; &ast; &ast;

    (D)  in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

122.    29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

123.    ERISA's fiduciary duties are the highest known to the law and must be performed with an eye exclusively to the interests of participants. ERISA fiduciaries exercising authority or control over plan assets, including the selection of plan service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of others, including service providers to the Plan such as recordkeepers or firms who provide investment products and services. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1). Defendants' fiduciary duties apply continuously in the administration of the Plan and do not abate upon the engagement of service providers. Fiduciaries must ensure that the amount of fees paid to service providers is reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for reasonableness.

124.    ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

34

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

125.    29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. §1109(a), which provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

126.    Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## VII.    CLASS ACTION ALLEGATIONS

127.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

128.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions

on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Class"):

> All participants and beneficiaries to the Mercedes-Benz U.S. International, Inc. Retirement and Savings Plan from January 1, 2015, through the date of judgment.

129.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

130.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

131.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 4,457 individual current Plan participants.

132.    **Existence and Predominance of Common Questions of Law and Fact**: Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.      whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b.      whether Defendants were fiduciaries to the Plan under ERISA;

c.      whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d.      whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e.      if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

f.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

g.      whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

133.    Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

134.    **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

135.    **Adequacy:** Plaintiffs are adequate representatives for the Class because their

37

interests do not conflict with the interests of the Class that they seek to represent; they were participants in the Plan during the Class Period, and continue to participate in the Plan; and they are committed to vigorously representing the Class. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

136.    **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

137.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief

and declaratory relief, as described below, with respect to the Class as a whole.

## VIII.  CAUSES OF ACTION

### COUNT I
### Breach of Duty of Prudence Under ERISA:
### Imprudent and Unreasonable Retirement Plan Service Fees
### (Plaintiffs, on behalf of themselves and the Class)

138.    Plaintiffs incorporate the above allegations as if fully set forth herein.

139.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

140.    29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

141.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable retirement plan service fees.

142.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

a.    ensure that the Plan's retirement plan service fees were reasonable;

b.    manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

c.    defray reasonable expenses of administering the Plan; and

d.    act with the care, skill, diligence, and prudence required by ERISA.

143.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

144.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by:

a.    Allowing the Plan to pay multiples of the reasonable per participant amount for the Plan's retirement plan service fees;

b.    Failing to properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures;

c.    Failing to defray reasonable expenses of administering the Plan; and

d.    Failing to act with the care, skill, diligence, and prudence required by ERISA.

145.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

146.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

147.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

148.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

149.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of

fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

## COUNT II
### Breach of Duty of Prudence Under ERISA:
### Imprudent and Unreasonable Investment Advisor Fees
### (Plaintiffs, on behalf of themselves and the Class)

150.    Plaintiffs incorporate the above allegations as if fully set forth herein.

151.    Defendants, as fiduciaries of the Plan, are responsible for selecting a Plan investment advisor that charges reasonable fees.

152.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

a.      ensure that the Plan's investment advisor fees were reasonable;

b.      manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

c.      defray reasonable expenses of administering the Plan; and

d.      act with the care, skill, diligence, and prudence required by ERISA.

153.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's investment advisor to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

154.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by allowing the Plan's investment advisor to charge three times the reasonable rate for services in 2016, and by failing to recoup the overpayment for the Plan.

155. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's investment advisor in comparison to other options.

156. Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

157. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

158. As a result of Defendants' breach of fiduciary duties, Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

159. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2) and (3).

### COUNT III
**Failure to Adequately Monitor Other Fiduciaries Under ERISA:**
**Imprudent and Unreasonable Retirement Plan**
**Service and Investment Advisor Fees**
**(Plaintiffs, on behalf of themselves and the Class)**

160. Plaintiffs incorporate the above allegations as if fully set forth herein.

161. Defendants had the authority to appoint and remove individuals responsible for retirement plan service fees for the Plan and investment advisor fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

162.    In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing retirement plan service fees for the Plan and investment advisor fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

163.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

164.    Defendants breached their fiduciary duties by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for retirement plan service fees for the Plan and investment advisor fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high retirement plan service and investment advisor fee expenses;

b.    Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate the availability of lower-cost recordkeepers;

c.    Failing to remove individuals responsible for retirement plan service fees for the Plan whose performance was inadequate in that these individuals continued to pay the same retirement plan service fees even though benchmarking and using other similar comparators would have shown that maintaining Voya as recordkeeper altogether or at the current level of fees being paid to it was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

165. As the consequences of the foregoing fiduciary breaches, Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

166. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for retirement plan service fees for the Plan. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control retirement plan service fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I. Such other and further relief as the Court deems equitable and just.

44

## IX.    NOTICE PURSUANT TO ERISA SECTION 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint with redactions as approved by the Court, a true and correct copy of this Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

Dated: April 22, 2021

By: */s/ James B. Eubank*
James B. Eubank
W. Daniel "Dee" Miles, III
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Telephone: (334) 269-2343
Fax: (334) 954-7555
james.eubank@beasleyallen.com
dee.miles@beasleyallen.com


Franklin D. Azar (admitted *pro hac vice*)
Paul R. Wood (admitted *pro hac vice*)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Ave
Aurora, CO 80014
Telephone: (303) 757-3300
Fax: (720) 213-5131
azarf@fdazar.com
woodp@fdazar.com

Steven A. Schwartz (admitted *pro hac vice*)
Beena M. McDonald (admitted *pro hac vice*)
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: 610-649-3633
sas@chimicles.com

bmm@chimicles.com

Counsel for Plaintiffs